Chad Belville IA Bar 015731
304 East Beth Drive
Phoenix, AZ 85042
602-904-5485
FAX 602-297-6953
cbelville@azbar.org
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| FRASERSIDE IP LLC, | ) | |
| An Iowa Limited Liability Company | ) | |
| | ) | No. 11-cv-03025-MWB |
| | ) | |
| vs. | ) | |
| | ) | BRIEF IN SUPPORT OF |
| | ) | RESISTANCE TO MOTION TO |
| Hammy Media Ltd, dba XHamster.com and | ) | DISMISS |
| www.xhamster.com and John Does 1 - 100 and | ) | |
| John Doe Companies 1 - 100 | ) | |
| | ) | |

COMES NOW, Plaintiff Fraserside IP LLC, by and through its counsel, Chad Belville,

and RESISTS Defendant's Motion to Dismiss in its entirety. In support of it Resistance to

Motion, Plaintiff provides the attached Brief and Attachments.

1

TABLE OF CONTENTS

AUTHORITIES………………………………………………………......................…….3

FACTS ……………………………………………………………………...…..6

LAW AND ARGUMENT ……………………………………………………….…..7

I.      Plaintiff Resists Defendant's Motion to Dismiss for Lack of Personal Jurisdiction …….7

        A.      The Standard for Granting a Motion to Dismiss for Lack of Personal

                Jurisdiction ……………………………………………………………….7

        B.      The Standard for Finding Personal Jurisdiction Over a Defendant ……………7

        C.      Defendant's Internet Activities Establish Specific Personal Jurisdiction ………..8

        D.      The Court May Exercise General Personal Jurisdiction Over Defendant……….20

        E.      The Court Should Alternatively Permit Jurisdictional Discovery by Plaintiff ....23

II.     Plaintiff is the Proper Assignee and Successor in Interest of all Rights in and to the

        Copyrighted and Trademarked Products and the Right to Sue for Accrued Infringement,

        And thus has Standing to Sue ……………………………………………………...25

III.    Defendant is not Entitled to Protection Under the Digital Millennium Copyright Act ....27

CONCLUSION …………………………………………………………………….33

2

TABLE OF AUTHORITIES

Cases

*Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)
.................................................................................7, 17, 18, 19

*Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741 (8th Cir. 2011)……………………….…..7

*Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir.1992) (per curiam)…………......7

*Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir.2008)……………………………………………8

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984)…………....8

*Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)……………………………………………8

*Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 504 (S.D. Iowa 2007)…………………………………8

*Lakin v. Prudential Sec., Inc.*, 348 F.3d 704 (8th Cir.2003)…………...9, 10, 19, 20, 21, 22, 23, 24

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997)…...9, 10, 11, 12

*Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir.2002)…………..10, 12, 19

*Bird v. Parsons*, 289 F.3d 865, 874-875 (6th Cir. 2002)…………………………………………11, 19

*CYBERsitter, LLC v. People's Republic of China*, 2011 WL 3322552 (C.D. Cal. 2011)
.............................................................................12, 13, 15, 16, 17, 19

*Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)……………13, 16, 17, 18

*Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284 (9th Cir.1997)…………………………………………………………………………..………15

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)……..16, 17

*AmerUs Group Co. v. Ameris Bancorp*, 2006 WL 1452808 (S.D. Iowa 2006)……………….....17

*Dryspace, Inc. v. Crawlspace Concepts, L.L.C.*, 2011 WL 1113585 (N.D. Iowa 2011)………..17

*Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir.1989) ……...……19

*Haisten v. Grass Valley Medical Reimbursement*, 784 F.2d 1392, 1397 (9th Cir.1986)……….19

*Lindgren v. GDT, LLC*, 312 F.Supp.2d 1125 (S.D. Iowa 2004)……………………………..20, 21

3

*Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 780-781, 104 S.Ct. 1473, 1481-1482 (1984)..23

*Abkco Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir.1991)………..………26

*Two Pepper Music v. Rhino Records, Inc.*, 173 F.3d 846 (2d Cir. 1999)………………..………26

*Getty Images (US) Inc. v. Advernet, Inc.*, --- F.Supp.2d ----, 2011 WL 2732202 (S.D.N.Y. 2011)
26

*Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir. 2005)………..…………26

*International Society for Krishna Consciousness of Western Penn., Inc. v. Stadium Authority of the City of Pittsburgh*, 479 F. Supp. 792 , 797 (W.D. Pa. 1979)………………….………..26

*Specht v. Google, Inc.,* 660 F.Supp.2d 858 (N.D. Ill. 2009)……………………….…………27

*In re Aimster Copyright Litigation*, 252 F.Supp.2d 634, 657 (N.D. Ill. 2002)………………..27

*Hendrickson v. Amazon.Com, Inc.*, 298 F.Supp.2d 914 (C.D. Cal. 2003)……………..……….27

*Fraserside IP L.L.C. v. Youngtek Solutions Ltd.*, __ F. Supp. 2d ___,  2011 WL 2689058, 8 (N.D. Iowa 2011)……………………………………………………………………..…………27

*Jessie v. Potter*, 516 F.3d 709, 713 n. 2 (8th Cir.2008)…………………………..…………27

*Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364 (8th Cir. 2011)…………………..……….27

*Noble Systems Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008)………..……….28

*Lundell v. Massey-Ferguson Services N. V.*, 277 F.Supp. 940 (D.C. Iowa 1967)………..……..28

*Stephens v. Associated Dry Goods Corp.*, 805 F.2d 812, 814 (8th Cir.1986)…………….…..28

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132 (N.D. Cal. 2008)…………………29

*Tur v. YouTube, Inc.*, 2007 WL 1893635 (C.D. Cal. 2007)………………………………....31

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001)……………………31

*Hendrickson v. Ebay, Inc.*, 165 F.Supp.2d 1082, 1093 (C.D. Cal. 2001)…..…………………32

*Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090 (W.D. Wash. 2004)……….………32

*MGM, Inc. v. Grockster*, 545 U.S. 913, 926, 125 S.Ct. 2764 (2005)……………………………32

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-1118 (9th  2007)……………………....32, 33

Case 3:11-cv-03025-MWB   Document 36-1   Filed 10/03/11   Page 4 of 35

Statutes

17 U.S.C. § 512……………………………………….…………………………….27, 28, 32

Other Authorities

Richard E. Kaye, J.D., Annotation, *Internet Web site activities of nonresident person or corporation as conferring personal jurisdiction under long–arm statutes and due process clause*, 81 A.L.R. 5th 41 (2000)………………………………………………………………..8

Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03…………..……………26

**Facts**

Plaintiff Fraserside IP LLC is the rightful owner of copyrights and trademarks in high quality brand driven adult motion picture films. Plaintiff, as successor in interest to sister and parent organizations, is engaged in the business of producing, distributing, and/or licensing to others the rights to copy, distribute, transmit and exhibit those copyrighted films and/or other audio visual works. Plaintiff and/or its parent and sister companies expend significant amounts of time, money and other resources to produce high quality products, develop supply chains and distribution systems, and build premium brand recognition of their products. Complaint, ¶ 5, p. 5. Plaintiff is also the holder of certain Trademarks, including a depiction of two female silhouettes, the Private and Private Gold Labels and the Private Life of that have been actively promoted and marketed. As a result, the purchasing public has come to know, rely upon and recognize these marks as an international brand of high quality entertainment. Complaint, ¶ 5-15. Plaintiff, either directly or through affiliates or licensees, distributes its copyrighted works in various forms, without limitation, over the Internet, pay-per-view, video on demand, DVD's, and other formats, by selling them directly or indirectly to the home viewing market or licensing others to do so and through Internet streaming and download services. Complaint, ¶ 5, p. 5.

Defendant is the owner and operator of the website Xhamster. Defendant's website offers adult entertainment to users all over the world. The site ranks number 55 in the United States according to Alexa.com and twenty percent of its visitors are from the United States. (Complaint, Attachment 2). Number 55 means that the website is one of the top in the world, getting more traffic than AOL (60), New York Times (87), NetFlix (98), Bank of America (142), Skype (154), Fox News (156), and Wal-Mart (229).

Defendant's website is offering, displaying and distributing Plaintiff's films to its Internet Users. Defendant knows, or has reason to know, that there is no proper license or authority to display and distribute Plaintiff's films on Defendant's website and no proper license or authority to obtain commercial financial gain from such display and distribution. Complaint, ¶ 31. Nevertheless, Defendant is distributing, showing and receiving Plaintiff's films without proper license, and infringing on Plaintiff's copyright.

**<u>Argument</u>**

**I.  Plaintiff Resists Defendant's Motion to Dismiss for Lack of Personal Jurisdiction**

    **A.  The Standard for Granting a Motion to Dismiss for Lack of Personal Jurisdiction**

Plaintiff bears the ultimate burden of proof on the issue of personal jurisdiction over the Defendant. However, "jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991). To defeat a motion to dismiss for lack of personal jurisdiction, Plaintiff here need only make a prima facie showing of jurisdiction. *Id.* "If the district court does not hold a hearing and instead relies on pleadings and affidavits, as it did here, the court must look at the facts in the light most favorable to the nonmoving party,… and resolve all factual conflicts in favor of that party." *Id.*; *See also, Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741 (8th Cir. 2011).

    **B.  The Standard for Finding Personal Jurisdiction Over a Defendant**

As Defendant notes, Iowa's long-arm statute extends personal jurisdiction over nonresidents to the fullest extent permissible under the Due Process Clause. See Iowa R. Civ. P. 1.306. *Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir.1992) (per curiam).

Case 3:11-cv-03025-MWB   Document 36-1   Filed 10/03/11   Page 7 of 35

Therefore, this Court only needs to examine whether the exercise of personal jurisdiction over Defendant comports with due process. *Hicklin*, 959 F.2d at 739.

"The Supreme Court has recognized two theories for evaluating personal jurisdiction: general and specific jurisdiction." *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir.2008) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984)). General jurisdiction arises when a defendant has carried on in the forum state a continuous and systematic, even if limited, part of its general business, and if so, the injury sued upon need not have any connection with the forum state." *Steinbuch*, 518 F.3d at 586.

"Specific jurisdiction on the other hand is appropriate only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities." *Id*.; *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985).

Defendant in its Motion to Dismiss fails to distinguish between these different forms of jurisdiction and the different standards and proof required for each. Plaintiff sets forth the requirements for the finding of jurisdiction and asks that this Court exercise jurisdiction over Defendant.

### C. Defendant's Internet Activities Establish Specific Personal Jurisdiction

"The continuous and illimitable presence of the internet has required fashioning special rules for applying the traditional due process test." *Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 504 (S.D. Iowa 2007). The "traditional territorial notions of personal jurisdiction, …have required re–examination in recent years in light of technological advances and the increasing globalization of the economy. Commercial uses of the Internet, in particular, have tested the limits of a territorial–based concept of jurisdiction." Richard E. Kaye, J.D., Annotation, *Internet*

8

*Web site activities of nonresident person or corporation as conferring personal jurisdiction under long–arm statutes and due process clause*, 81 A.L.R. 5th 41 (2000).

The Eighth Circuit Court of Appeals addressed the issue of whether a website may provide sufficient contacts to invoke jurisdiction in *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704 (8th Cir.2003). As the court noted there, a prima facie case of specific jurisdiction is established by showing that the Defendant has purposely directed its activities at Iowa residents, and that the claims in the suit either arise out of or relate to the defendant's activities. *Lakin*, 348 F.3d at 707. Discussing the unique aspects of basing jurisdiction on Internet activities, the court turned, as many other courts have, to *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997). Taking its cue from *Zippo*, the Eighth Circuit noted that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of the commercial activity that an entity conducts over the Internet." *Id*. at 701, quoting *Zippo*. The *Zippo* court devised a "sliding scale" approach to determine the nature and quality of the Internet activity, stating:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. <u>If the defendant enters into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.</u> At the opposite end are situations where a defendant has simply posted information on an Internet [website] which is accessible to users in foreign jurisdictions. A passive [website] that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive [websites] where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website].
> *Zippo*, 952 F.Supp. at 1124.

In *Lakin,* the Eighth Circuit analyzed the sliding scale method outlined in Zippo and concluded that it was proper for use in cases where specific personal jurisdiction was alleged.[1] *See Lakin*, 348 F.3d at 711. Because the fact situation in *Lakin* concerned only general jurisdiction, the Eighth Circuit provided no further guidance for the application of the *Zippo* sliding scale. However, as *Zippo* taught, at the top of the scale is the situation where "the defendant enters into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet," in which case, personal jurisdiction is proper. *Zippo*, 952 F.Supp. at 1124. Under this analysis, the operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state "if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir.2002).

The Sixth Circuit Court of Appeals provided an example of what type of website had the interactivity necessary for the exercise of specific jurisdiction. *Neogen Corp. v. Neo Gen Screening, Inc.*, *supra.* As in this case, *Neogen* involved trademark infringement. The defendant company provided blood testing for newborns. The defendant accepted blood for testing and accepted payment from residents in Michigan. It packaged the results of the tests and made the results available over the Internet, providing passwords to Michigan residents. The court found that establishment of a paid area accessible only to members is characteristic of a website with a high degree of interactivity. *See Neogen*, 282 F.3d at 890-91. The Court held that Neogen had presented a prima facie case that NGS transacted business in Michigan by showing the interactive nature of the website. "When Michigan residents purchase NGS's services, for example, NGS provides them with passwords to access their test results on the website from

---

[1] Defendant ignores this holding of *Lakin*.

Michigan. The granting of passwords to Michigan residents as part of a contract for NGS's services is an interactive usage showing that NGS has intentionally reached out to Michigan customers and enabled them to use NGS's services from Michigan." Thus, the court found it appropriate to exercise specific jurisdiction over the defendant, NGS.

Likewise, in *Bird v. Parsons*, 289 F.3d 865, 874-875 (6th Cir. 2002), the Sixth Circuit court held that the defendants, by maintaining a website on which Ohio residents could register domain names and by allegedly accepting the business of Ohio residents, satisfied the purposeful-availment requirement and were subject to specific jurisdiction. There, the fact that the defendant regularly chose to do business with Ohio residents was sufficient. *Id.*

Here, Defendant's website is not a mere passive website such as those at the bottom of the Zippo sliding scale. These websites do much "more than make information available to those who are interested in it." *Zippo Mfg.*, 952 F.Supp. at 1124. The website falls on that end of the spectrum "where a defendant clearly does business over the Internet" by "enter[ing] into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet," and thus, specific personal jurisdiction is proper. *Id.*

On Defendant's website, users are encouraged not just to view the videos on the websites. They are encouraged to open their own profiles and up their rank by getting additional comments, with 0-50 comments ranking a user a "Newbie" and 25,000+ ranking the user an "Xhamster Legend." Users can have up to 5,000 friends. Users upload their own videos as well. (Exhibit A, Current Xhamster Terms page).

Users also have the option of paying $29.95 per month (the amount clearly listed in U.S. Dollars) to buy a premium membership. (Exhibit B, Premium Membership page, with redactions). Premium users can not only view the videos posted, but download those videos, get

additional promotion within the Xhamster community on the Community page, and get e-mail notifications just for Premium members. As in *Neogen* this interactive usage shows intentional reaching out to Iowa residents by Defendant with the use of promotional e-mails for Premium Members. It is clearly "enter[ing] into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet." *Zippo Mfg*., 952 F.Supp. at 1124.

The U.S. District Court for the Central District of California recently decided a case very similar to this one using the tests for specific jurisdiction developed by the Ninth Circuit Court of Appeals. In *CYBERsitter, LLC v. People's Republic of China*, 2011 WL 3322552 (C.D. Cal. 2011), Plaintiff was the developer of Internet parental control software. It alleged that Chinese companies had targeted Plaintiff by obtaining its code for the software and using it to develop their own software programs, and/or reproducing, adapting, and/or distributing Plaintiff's copyrighted work without authorization. As to jurisdiction, Plaintiff alleged that the companies knew that Plaintiff was a U.S. company and that the defendants' acts would cause injury in the U.S. and in California, the forum state. Plaintiff also claimed that the defendants made the infringing software program available for download to individuals in the United States and had made Plaintiff's code for the software publicly available on its servers. The Plaintiff alleged that a third defendant, who engaged in other activity in California, distributed computers with Plaintiff's software code in China.

The California court used the Ninth Circuit's three-part test to determine whether a district court can exercise specific personal jurisdiction over a nonresident defendant. First, the defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege

of conducting activities in the forum. Second, the claim must be one which arises out of or relates to the defendant's forum-related activities. Third, the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *CYBERsitter*, 2011 WL 3322552, 6.

The first test, whether there has been purposeful availment of the privilege of doing business in the forum, is the threshold test, of course. The Ninth Circuit evaluates this issue using a form of the "Calder-effects" test, taken from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Id. The test requires that defendant allegedly must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id*.

The California district court found that the intentional act requirement was easily met as to all defendants. "Courts "construe 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *CYBERsitter*, at 6. Any one of the alleged acts of theft, misappropriation, and subsequent distribution of Plaintiff's code were all actual, physical acts, even if done by computer.

Here, too, Plaintiff's allegations show that Defendant has knowingly allowed its users to upload Plaintiff's videos to Defendant's websites, stored them on the host computer and made them available for download throughout the United States. Defendant clearly targets U.S. users. Evidence of this is found in its Webmaster Sign up page. Defendant offers up to $2.00 (in U.S. dollars) per 1,000 unique visitors to webmasters who act like salespeople on commission – they can build webpages with links back to XHamster, and if a surfer follows that link to XHamster then XHamster pays the webmaster. (Exhibit C, Xhamster partnership program). The Terms of

Use posted by Defendant prior to this suit stated "The content on the xHamster Website, except all User Submissions (as defined below), including without limitation, the text, software, scripts, graphics, photos, sounds, music, videos, interactive features and the like ("Content") and the trademarks, service marks and logos contained therein ("Marks"), are owned by or licensed to xHamster, subject to copyright and other intellectual property rights under <u>United States</u> and foreign laws and international conventions." ( Exhibit G, Defendant Archived Terms of Use, Section 4, Intellectual Property Rights).

In addition, Xhamster's current Terms page shows its intent to service United States citizens and comply with U.S. laws. Section 3.2.5 indicates it cooperates with "any law-enforcement agency investigating child pornography," and that it complies with the U.S. law – citing 18 U.S.C. 2258A. Xhamster cites other U.S. laws as well, such as 47 U.S.C. §230(d) in Section 5.8 and the "First Amendment to the United States Constitution" in Section 4.2, and acknowledges that it complies with U.S. laws in Sections 6.3 and 13.1. The terms of use also state all money in terms of U.S. Dollars, including Sections 5.5 and 5.2.19, which set a liquidated damage amount of $5,000 infringement of Xhamster's copyrights or trademarks. (Exhibit A, Current XHamster Terms).

Internet usage statistics and Xhamster.com's reach also shows that it is targeting United States citizens. As alleged in Plaintiff's complaint, Xhamster.com is ranked by Alexa, a website rating service, as the #56 most visited website in the world, and #55 in the United States. Twenty Percent of its visitors are in the United States. Plaintiff has alleged that discovery will show numerous Iowan's are customers of Defendant's sites. (Attachment 2 to Complaint, ¶ 22.)

Defendant appears to review videos and pictures that are uploaded. Archives of Xhamster's FAQ from August of 2010 shows that uploaded videos are moderated – reviewed –

by Xhamster before posting on the site. Exhibit F, Archived FAQ's. More recent FAQ's show that it converts each video and that certain rules must be followed with regard to uploads. Exhibit A, Current Xhamster.com FAQ. Thus Defendant is aware that the videos it is offering are Plaintiff's videos, and that the distribution to its users infringes on Plaintiff's copyrights and trademarks. (See Exhibit A, Current Xhamster FAQ's, pp. 6, 7). As a result, these actions were done knowingly, and in the actual, physical world.

Next, the *CYBERsitter* court looked at whether the activities of the defendants were expressly aimed at the forum state. The requirement of express aiming requires more than "'untargeted negligence' that merely happens to cause Plaintiff harm." *CYBERsitter* at 8. The court cited the Ninth Circuit's previous decision in *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284 (9th Cir.1997), rev'd on other grounds, 523 U.S. 340, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998), and noted that "an allegation of a defendant's willful copyright infringement against a plaintiff with knowledge of plaintiff's principal place of business satisfies the Calder effects test." *Id.* citing *Columbia Pictures* at 289.

In *CYBERsitter*, the defendants argued, as Xhamster does here, that no express aiming occurred because, even if Plaintiff's allegations were true, the defendants did nothing above and beyond willfully infringing Plaintiff's copyright with the knowledge that Plaintiff resided in California, and never distributed or marketed the allegedly infringing products in California. The court disagreed, pointing to the Ninth Circuit's decision in *Columbia Pictures* that an allegation of willful copyright infringement knowingly directed at a forum resident "alone" is sufficient to satisfy purposeful availment. *Id* at 10, citing *Columbia Pictures*, 106 F.3d at 289. Thus, "[t]aking Plaintiff's allegations as true" the Court found that Plaintiff had stated a prima facie case showing that the defendants expressly aimed their conduct at Plaintiff. "Here, a software developer

15

alleges that foreign software developers and computer manufacturers intentionally stole its copyrighted software—the very basis of its business—and conspired to distribute it to Chinese-speaking customers throughout China and the United States." This constituted intentional express aiming under the Calder test. *Id*. at 9. "When Defendants commit intentional copyright infringement with knowledge of plaintiff's residency, … they 'should reasonably anticipate being haled into court' in the forum in which Plaintiff resides, as the brunt of the injury takes place there." *Id*.

Here, too, the infringement of Plaintiff's videos was expressly aimed at harming Plaintiff in its business. Defendant permitted the uploading of Plaintiff's videos to its website with the intent that they would be distributed to and viewed and downloaded by Defendant's Premium members – its paying users. The Defendant moderates, reviews and screens the videos before posting them on its website, so Defendant knew they were Plaintiff's videos, and knew that Defendant had no license or authority to distribute the videos. Defendant then conspired to and did distribute and make the videos available to residents in the United States and Iowa. This is express aiming, and this court should so find.

The last element in the Ninth Circuit's purposeful availment test is the harm likely to be suffered in the forum state. To satisfy this element, "the 'brunt' of the harm need not be suffered in the forum state," but only "a jurisdictionally sufficient amount of harm." *CYBERsitter*, at 10. Further, Plaintiff satisfies this element if it alleges that defendant's intentional act has 'foreseeable effects' in the forum. Id. The *CYBERsitter* court quoted *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010): "In this case, it was foreseeable that [plaintiff] would be harmed by infringement of its copyright, including harm to its business reputation and goodwill, and decreased business and profits. It was also foreseeable that some of

16

this harm would occur in the Forum, where [plaintiff] was known to reside." *Id.* The court held that plaintiff had met the third and last prong of the test, as it alleged that the misappropriation of Plaintiff's copyrighted material would cause harm to Plaintiff in California, and that all of the defendants knew Plaintiff was an American company and that their actions would cause injury to Plaintiff in California. The court thus denied the Motion to Dismiss.

This Court should do the same. It was imminently foreseeable to Defendant that Plaintiff would be injured by the unrecompensed offering of Plaintiff's videos on Defendant's website. Defendant knew that Plaintiff would lose profits by its acts, that Plaintiff was an American business and that it was located in Iowa. Thus, this Court should also find that Plaintiff has made a prima facie case showing that it has specific personal jurisdiction over the Defendant. The cases that Defendant cites to support its motion are radically different factually, and thus don't apply here. In *AmerUs Group Co. v. Ameris Bancorp*, 2006 WL 1452808 (S.D. Iowa 2006), the defendant was a Georgia corporation with no business contacts in Iowa. Although it had a website, only persons already customers and who paid a monthly fee could use the Internet interactive services, and only persons who visited one of its local banks in Georgia, Florida, or Alabama could be a customer. Thus, a resident in Iowa could not do business with the company from Iowa. Here, on the other hand, Defendant is open to doing business with any and all residents of Iowa, who won't even have to leave the comfort of their homes to do so. Discovery will show that Defendant does indeed have customers in Iowa.

The other case Defendant cites, *Dryspace, Inc. v. Crawlspace Concepts, L.L.C.*, 2011 WL 1113585 (N.D. Iowa 2011) is likewise distinguishable since the defendant there never did any business with a resident of Iowa and its website was not of the interactive type found in this case.

17

Notably, Defendant fails to cite the Eighth Circuit Court of Appeals' decision in *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991). The case, though not involving Internet activity, demonstrates that the Eighth Circuit would likely follow the reasoning in *CYBERsitter* and find specific personal jurisdiction in this case. Like the California court, the Eighth Circuit there applied the *Calder* "effects" test, and adopted it as an additional test for specific jurisdiction. *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390-1391 (8th Cir. 1991).

In *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, the Plaintiff, Dakota Industries, claimed trademark infringement by Dakota Sportswear. Sportswear had no offices, outlets, agents or employees in the forum state (South Dakota), and had never marketed or advertised in South Dakota, and never directly or indirectly shipped products into South Dakota. The evidence showed, however, that the end purchasers of Sportswear's clothing were located throughout the entire United States. Further, major chains carried Sportswear clothing, and thus, if the chains to which Sportswear sold had outlets in the forum state (South Dakota), Sportswear's clothes could be shipped there.

The Court cited Calder for the proposition that the defendant's lack of control over distribution of the product in the forum state would not bar jurisdiction when the plaintiff has alleged an intentional tort. *Id.*, citing *Calder* at 789-90, 104 S.Ct. at 1487. The evidence showed that there was some "passing off" (where the deceived customer buys the defendant's product believing it is the plaintiff's) of Sportswear's infringing clothing in South Dakota. This fact, along with the fact that Industries' principal place of business was in South Dakota, demonstrated that "Sportswear's actions were uniquely aimed at the forum state and that the 'brunt' of the injury would be felt there, as required by *Calder*. Under these circumstances, Sportswear 'must

18

reasonably anticipate being haled into court' in South Dakota." *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d at 1391. The Court therefore held that Plaintiff had made a prima facie showing of personal jurisdiction, reversed the dismissal and remanded for further proceedings.

In *Dakota*, the Eighth Circuit also made special note of two Ninth Circuit Court of Appeals cases that held that jurisdiction may be proper when defendant's only contact with the forum state is the "purposeful direction" of a foreign act having effect in that state: *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir.1989); *Haisten v. Grass Valley Medical Reimbursement*, 784 F.2d 1392, 1397 (9th Cir.1986). It is safe to presume that the court would have followed the analysis in *CYBERsitter* and came to the same conclusion: that exercising personal jurisdiction is proper.

The facts of this case are comparable to those in *Dakota*, *CYBERsitter*, *Neogen* and *Bird v. Parsons*, where the courts found specific personal jurisdiction could be exercised over the defendants. Here, as in the Internet cases, Defendant maintains interactive websites where users in the U.S. pay a fee for Defendant to distribute Plaintiff's videos to them, causing injury to Plaintiff, an Iowa corporation. Further, Defendant is accepting the business of Iowa residents, offering Iowa residents the opportunity to become paying members and so view upgraded videos and download premium versions of Plaintiff's films, many involving the pirated videos copyrighted and owned by Plaintiff. By these activities, Defendant has purposefully directed its activities at Iowa residents and purposefully availed itself of the privilege of doing business in Iowa as required for specific jurisdiction. Further evidence of availment to Iowa customers will be found in discovery.

For the court to exercise specific jurisdiction, it must also find that the plaintiff's action arises out of or relates to the defendant's forum-related activities. *Lakin, supra*. Here, the activities of defendant – allowing Iowa residents to view the Plaintiff's pirated videos – is exactly what Plaintiff sues for in this action. Consequently, the elements of specific personal jurisdiction are met in this case, and the Court may exercise jurisdiction over Defendant. The court should therefore deny the Motion to Dismiss.

**D.     The Court May Exercise General Personal Jurisdiction Over Defendant**

Even if the Court finds no specific personal jurisdiction over Defendant exists, the facts support a finding of general jurisdiction.

In *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704 (8th Cir.2003), the court held the Zippo test insufficient by itself to determine the propriety of exercising general jurisdiction. *Id*. at 711-12. Although the court found that the *Zippo* test was the starting point for determining if a website created general jurisdiction for a defendant, the court directed that after looking at the nature and quality of a website (that is, applying the *Zippo* test), courts must then weigh the quantity of the defendant's contacts via its website. *Lakin*, 348 F.3d at 712. Thus, under *Lakin*, a defendant with a website that is interactive in nature, and with a quantity of contacts with the forum, may be subject to the exercise of general jurisdiction in the forum.

Addressing the issue of general jurisdiction, the Defendant compares the case before this court to *Lindgren v. GDT, LLC*, 312 F.Supp.2d 1125 (S.D. Iowa 2004). There the Iowa plaintiff sued a California company for trademark infringement. The defendant maintained a website and sold some of its infringing products to Iowa residents. The court found that Iowa did not have jurisdiction. The case does not apply here, however, because the court based its decision on factors not present in this case.

20

First, the court noted that defendant GDT's website consisted primarily of single point-of-sale transactions rather than continuous, long-term contracts. Visitors to the site, even purchasers, could establish an online account, but it entailed no continuing obligations. The *Lindgren* court contrasted this fact with the facts in *Lakin*, where the defendant maintained a sophisticated, interactive twenty-four hour Web site which allowed users to exchange information with the host computer, and establish accounts and apply online for loans. *Id*. at 1130.

The situation here is like that in *Lakin*, not *Lingren*. Here, Defendant's websites allow users to establish membership which does entail an ongoing commitment to a monthly fee. It also entitles the purchaser to ongoing communication with Defendant's host computer for the purposes of downloading and viewing videos, uploading videos and interacting with other members of the community through their profiles on a twenty-four hour basis. This is the type of systematic, continuous relationship found in *Lakin*, not the occasional sales found in *Lindgren.*

Further, the *Lindgren* court also found it significant that the sales were goods under the Uniform Commercial Code. Under the U.C.C., the sales to Iowa residents were not made to Iowa. Instead, they were "F.O.B. seller," so that the title passed to the Iowa buyer in California when defendant delivered the items to FedEx for shipment. Here, the user is streaming videos to his home computer in Iowa, and there is no "F.O.B." term in the contract, as nothing is shipped. Thus, this element for denying jurisdiction does not exist here.

The facts in the Eighth Circuit's decision in *Lakin* provide a closer comparison for the analysis of Defendant's contacts. In *Lakin*, the defendant, Prudential Savings, was located in Georgia. The Plaintiff sued in Missouri. The court found that although Prudential had no offices in Missouri, it did have a website and did have loans with Missouri residents. The court found

21

that the website was sophisticated, provided interaction such that the user could exchange information with the host computer, allowed consumers to establish and access secure online accounts, calculate home mortgage rates and complete online applications for home equity loans and lines of credit. Thus, "[t]hrough its Web site Prudential Savings could have continuous, significant contacts with Missouri residents. In fact, because its site is available twenty-four hours a day, it is possible for Prudential Securities 'to have contacts with the [State of Missouri] that are 'continuous and systematic' to a degree that traditional foreign corporations can never even approach.'" *Lakin,* 348 F.3d at 712. The court also found it notable that the financial interactions with users were not single point of sale transactions, but involved loans measured over years, meaning that the defendant created continuous long-term contacts with its users. *Id.* at 708.

Here, Defendant's websites are highly interactive. They are sophisticated websites that provide interaction such that the user can exchange videos, uploading their own, downloading others, interacting with fellow users. They thus exchange information with the host computer just as in *Lakin*. Further, with the premium membership, users don't have one single point of sale transaction. Instead, they have ongoing and continuous obligations to defendant. Thus, like the defendant in *Lakin*, Defendant here has the quality and nature of contacts to subject it to general jurisdiction.

In addition, the relationship here between Defendant's websites and their users is akin to a more traditional, and thus more familiar, contract – the magazine seller and its subscribers. Like the magazine subscriber, users receive the content right in their own state and their own home. The magazine seller sends it by mail, the website owner transmits it at the users behest over the Internet. The Supreme Court has found the magazine subscription contract to be the

22

basis for jurisdiction in a state where a corporation continuously had customers in the forum's market, and has held that under the circumstances, the defendant "must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *See e.g.*, *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 780-781, 104 S.Ct. 1473, 1481-1482 (1984). Likewise here, Defendant's continuous exploitation of the Iowa market would certainly make it reasonable to anticipate being haled into court here regarding the infringement of Plaintiff's copyrights and trademarks.

The next step in determining general jurisdiction is whether the defendant has the quantity of contacts necessary to allow the court to exercise general jurisdiction over defendant. *Lakin*, 348 F.3d at 712. The relevant inquiry regarding quantity of contacts is not whether the percentage of a company's contacts is substantial for that company; rather, the inquiry focuses on whether the company's contacts are substantial for the forum. *Lakin*, 348 F.3d at 709.

Here, as in *Lakin*, the quantity of contacts in Iowa – how many users, how many web visits, how many premium members and other information, is as yet unknown. This is not publicly available information. Thus, as in *Lakin*, (unless the court finds specific jurisdiction exists over Defendant) the Court must permit Plaintiff to undertake jurisdictional discovery.

**E.    The Court Should Permit Jurisdictional Discovery by Plaintiff**

The Court in *Lakin* also established when a Plaintiff should be permitted jurisdictional discovery if there is not sufficient evidence to determine the extent and nature of the Defendant's contacts with the forum state without it. *Lakin*, 348 F.3d at 712-713. If the record does show that asserting jurisdiction would be reasonable and would not offend notions of fair play and substantial justice (that is, it would comport with due process), then Plaintiff should be permitted discovery on such things as the number of times Iowa residents have accessed the websites, the

number of Iowa residents that have signed on for premium services, and any other data showing interaction between Defendant's websites and Iowa residents. *Lakin*, 348 F.3d at 712-714. Here, it would comport with due process to exercise jurisdiction over Defendants. The attachments to the Complaint show that U.S. customers make up some 20 percent of the Defendant's world-wide market. Since the U.S. population is only 4.5% of the world population, this means that the "company's contacts are substantial" for the U.S. forum. At this time, there is no publicly available evidence of the extent of Defendant's contacts specifically with Iowa.

In *Lakin*, the court found that the interest of the state in providing a forum was an element of finding due process. 348 F.3d at 713. Here, Plaintiff is an Iowa corporation whose trademarks are being infringed by Defendant. Thus, Iowa has a significant interest in providing a forum for redress of Plaintiff's rights. Further, Defendant has provided not a clue as to where in the United States it might be fair to sue it. Instead, it asserts that Plaintiff should sue it in Cyprus where it has a post office box, even though a full 20% of its business is from United States residents, it bills in US Dollars and offers direct payment from US bank accounts, uses US law references in its terms, and pays for internet traffic in US dollars. Because there are certain to be residents in Iowa who do business with Defendant's websites, which will be proven during discovery, and because Plaintiff, the corporation suffering the injury because of Defendant's websites, is located here, exercising personal jurisdiction in Iowa does comport with due process.

The *Lakin* court also considered the burden on the defendant to travel here. *Lakin*, 348 F.3d at 713. Again, however, Defendant has substantial business in the United States. For it to contend that even though a fifth of its websites' business is from the U.S., it may not be sued here does not show "fair play and substantial justice." Because the Defendant has contacts with

24

Iowa, the burden is not overly heavy on Defendant and due process permits it to be called to defend the clams here.

Because the evidence on the record thus far shows it would be reasonable and would not offend notions of fair play and substantial justice, the Court "must" allow jurisdictional discovery to permit Plaintiff to discover information regarding Defendant's contacts with Iowa residents if the Court determines that the current record does not establish personal jurisdiction over Defendant.

## II. Plaintiff is the Proper Assignee of all Rights in and to the Copyrighted and Trademarked Products and The Right to Sue for Accrued Infringement, and Thus Has Standing to Sue

Plaintiff alleged in its Complaint the ownership of the copyrights and trademarks at issue here. Complaint, ¶ 27. Defendant claims that because a transfer is not showing in the public records that the Plaintiff has no standing. Plaintiff re-asserts that it is the rightful owner of all copyrights and trademarks claimed, and Plaintiff has witnesses and documentation to prove it. Plaintiff's ownership rights are not bare assignments of the right to sue but all rights and ownership of the copyrights and trademarks and all transfers have been or will be delivered to the respective copyright and trademark offices. Plaintiff acquired its full rights through the Assignment of Copyright and Common Law Copyright Rights attached hereto as Exhibit D. The fact that the public records of the Copyright office did not show this at the time of Defendant's Motion does not negate the transfer. Further, the USPTO does now show in its public records that the claimed trademarks have been transferred. See Exhibit E, Certificate of Transfer of Trademarks.

The Assignment "sells, assigns, transfers and conveys to [Plaintiff] all of [the] right, title

25

and interest to the Copyrights, together with the goodwill of the business associated with the Copyrights." In addition, the Assignor assigned to Plaintiff "the right to sue for and receive all damages accruing from past infringements of the Copyrights herein assigned."

The generally accepted law is that an owner of an exclusive right in the copyrights is entitled to sue for an infringement of that right which was committed prior to the assignment of the copyright, provided that the document granting the copyright explicitly that it includes the causes of action with respect to that right, accrued prior to the grant. *See Abkco Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir.1991) ("Thus, a copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them."); *Two Pepper Music v. Rhino Records, Inc.*, 173 F.3d 846 (2d Cir. 1999)("Where the assignment of an exclusive right under a copyright expressly includes the right to prosecute accrued claims for infringement, that right passes to the assignee."); *Getty Images (US) Inc. v. Advernet, Inc.*, --- F.Supp.2d ----, 2011 WL 2732202 (S.D.N.Y. 2011); see also Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03.

The cases cited by Defendant agree. For instance, the Ninth Circuit in *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir. 2005) acknowledged and agreed with the holding in *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, *supra*. Thus, the law provides that because Plaintiff has both the current ownership of the copyrights and the right to sue for past infringement, it has standing in this case. The court should thus deny the Motion to Dismiss.

The same is true with respect to Plaintiff's trademark infringement claims. Plaintiff is the assignee of the rights to the trademarks, and to the business associated with it, as cases cited by Defendant require. See *International Society for Krishna Consciousness of Western Penn., Inc. v. Stadium Authority of the City of Pittsburgh*, 479 F. Supp. 792 , 797 (W.D. Pa. 1979), cited by

Defendant at p. 15; See also, *Specht v. Google, Inc.,* 660 F.Supp.2d 858 (N.D. Ill. 2009). Plaintiff attaches the Notice of Assignment from the US Patent and Trademark Office as Exhibit E. Thus Plaintiff has standing to assert the trademark infringement claims.

### III.    Defendant is not Entitled to the Protection of the Digital Millennium Copyright Act

Xhamster also cites the provisions of the Digital Millennium Copyright Act as grounds for dismissal.  Surprisingly, in the same Motion that Defendant argues this case should be dismissed and tried in a Cyprus court, Defendant alleges protection under United States law. Xhamster argues that under the "safe harbor" protections of 17 U.S.C. § 512(c), Plaintiff's failure to allege that it issued a takedown notice as provided by the statute requires the Court to dismiss the Complaint.

Xhamster has missed a very important step in the process of obtaining dismissal under the safe harbor provisions of Section 512(c): proof that it is entitled to the safe harbor protections. If it is not entitled to the protection of the statute, then Plaintiff had no obligation to send a takedown notice.

"Liability protection under the DMCA is an affirmative defense and, as such, Defendants bear the burden of establishing its applicability." *In re Aimster Copyright Litigation*, 252 F.Supp.2d 634, 657 (N.D. Ill. 2002); See also *Hendrickson v. Amazon.Com, Inc.*, 298 F.Supp.2d 914 (C.D. Cal. 2003). This Court has also acknowledged that the DMCA "safe harbor" provision is an affirmative defense. *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.*, __ F. Supp. 2d ___, 2011 WL 2689058, 8 (N.D. Iowa 2011).

As a general rule, the possible existence of an affirmative defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense. *Jessie v. Potter*, 516 F.3d 709, 713 n. 2 (8th Cir.2008), *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364

(8th Cir. 2011)(statute of limitations); *Noble Systems Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008)(privilege).

Here, Defendant has made no effort to point out what in the Complaint shows that they come within the safe harbor of Section 512(c). As a result, it has not met its burden of proof, and the Court should deny the motion to dismiss.

Even if Defendant had tried to prove that it falls within the statute, it would fail. Motions to dismiss are sparingly granted and in passing on such a motion the court accepts well pleaded allegations of fact as true, in a light most favorable to the plaintiff. *Lundell v. Massey-Ferguson Services N. V.*, 277 F.Supp. 940 (D.C. Iowa 1967). The Court is "bound to accept as true, for purposes of [a Rule 12(b)(6) ] motion, the facts alleged by the plaintiff." *Stephens v. Associated Dry Goods Corp.*, 805 F.2d 812, 814 (8th Cir.1986).

The starting place for looking at whether Xhamster should be granted dismissal is the statute, 17 U.S.C. § 512(c) provides:

> (1) In general.--A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright <u>by reason of the storage at the direction of a user of material that resides on a system</u> or network controlled or operated by or for the service provider, if the service provider--

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

Next, the Court must review the Complaint for allegations that might admit that Xhamster may take advantage of this safe harbor exception to liability. However, the opposite is true. The Complaint instead shows that Xhamster does not fall within its provisions.

The Complaint alleges that Defendant does business as Xhamster.com and operates the website Xhamster.com. Complaint, ¶ 18. The website provides adult-oriented audio-visual content to the general public without request for age-verification. Complaint, ¶ 21.

Under the statute, the first element of proof is that the Defendant is a service provider. Defendant must prove that it is a service provider. Next, Defendant must prove that the allegedly copyright infringing material resides on the Defendant's system "by reason of the storage at the direction of a user of material," rather than at Defendant's instance. Material that resides on the system or network operated by Defendant through its own acts or decisions are excluded from DCMA safe harbor protections. *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132 (N.D. Cal. 2008).

Plaintiff's Complaint alleges that Defendant is doing more than just allowing storage of Plaintiff's videos on its websites at the instance of a user of the material. These allegations raise an inference that Defendants are posting material and disseminating material on their own:

Complaint, ¶ 32: Defendant is truly a subscription membership web site hiding behind the veneer of a simple user-generated content exchange site.

Complaint, ¶ 33: Defendant offers unauthorized content for free that legitimate competitors must pay for, with extraordinary results.

Complaint ¶ 34: Defendant uses these sites to display and distribute Plaintiff's films,

29

among others, to Internet Users… The fundamental purpose of the website is to capitalize on the illegal dissemination and contribute to the illegal dissemination of infringing works.

Complaint, ¶ 36: As opposed to legitimate user generated content exchange sites, Defendant's websites induce the Internet user to pay subscription fees.

Complaint, ¶ 37: Upon information and belief, Xhamster.com does not initially allow users to view high quality versions of Plaintiff's films or download Plaintiff's film to the user's computer, although a significant portion is displayed and distributed. If the Internet user wishes to view the film in High Definition, or download the video, the user is presented this the option by becoming a Premium Member. The website user is presented with three (3) Premium Membership choices, (1) a $2.95 trial membership that automatically becomes a recurring membership if the user does not cancel, a one (1) month Premium Membership for $29.95 or (3) a three month Premium Membership for $19.98 per month. See Exhibit B, Premium Membership page. Upon information and belief, this Paid Premium Membership allows the website user to download the unauthorized and uncompensated copyrighted work belonging to Plaintiff, allowing Defendant to commercially benefit from Plaintiff's work without any benefit to Plaintiff.

Complaint, ¶ 40: Upon information and belief, Plaintiff's copyrighted works have been and continued to be infringed by Defendant and the Doe Defendants through the reproduction, distribution, and public display of Plaintiff's films by and through the Internet Web site Xhamster.com for which Defendant owns the domain registrations.

All of these allegations show Defendant taking an active role in the reproduction, distribution and display of the infringed material. These allegations show that Defendant does not fit within the statute's requirements to garner its protections. On this ground alone, the Court

30

should deny the Motion to Dismiss.

However, even if Defendant showed that the materials were only put on its websites at the instance of users, this does not end the discussion. Defendant must next show that it lacked actual knowledge of the infringing material or was not aware of facts or circumstances from which infringing activity was apparent on its system or network and/or acted expeditiously to remove or disable access to the material upon obtaining such knowledge or awareness. 17 U.S.C. § 512(c)(1)(A)(i)-(iii); *Tur v. YouTube, Inc.*, 2007 WL 1893635 (C.D. Cal. 2007).

The immunity of the DMCA "is not presumptive, but granted only to 'innocent' service providers who can show that they do not have a defined level of knowledge regarding the infringement on their system. The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e. at the moment it becomes aware that a third party is using its system to infringe." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001).

It is clear that Defendant does have the right and ability to control the activity and directly benefits financially from the infringement of Plaintiff's copyrights. Archives of Xhamster's FAQ from August of 2010 shows that uploaded videos are moderated – reviewed – by Xhamster before posting on the site. Exhibit F, Archived FAQ's. More recent FAQ's show that it converts each video and that certain rules must be followed with regard to uploads. Exhibit A, Current Xhamster.com FAQ.

In addition, because Defendant reviews the videos, it has to know that it is posting and distributing Plaintiff's videos. The Complaint states that "Plaintiffs have taken industry standard steps to identify their products, including placing recorded warnings at the beginning and end of video productions and embedding "watermarks" in their videos that appear whenever those

31

videos are played." Complaint, ¶ 5, p. 5. Thus, here again it becomes clear that Defendant had "actual knowledge of the infringing material" or was "aware of facts or circumstances from which infringing activity was apparent on its system or network." 17 U.S.C. § 512(c)(1)(A)(i)-(ii). As a result, Defendant is not entitled to take advantage of the safe harbor intended for innocent service providers. Defendant is not one of the innocent.[2]

Defendant must also show that it did "not receive a financial benefit directly attributable to the infringing activity," if it had "the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). The 'right and ability to control' infringing activity, as the concept is used in the DMCA, has been held to mean "something more" than just the ability of a service provider to remove or block access to materials posted on its website or stored in its system." *Hendrickson v. Ebay, Inc.*, 165 F.Supp.2d 1082, 1093 (C.D. Cal. 2001); *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090 (W.D. Wash. 2004). This requirement has been held to presuppose some antecedent ability to limit or filter copyrighted material. *Tur v. YouTube, Inc.*, 2007 WL 1893635 (C.D. Cal. 2007), citing *MGM, Inc. v. Grockster*, 545 U.S. 913, 926, 125 S.Ct. 2764 (2005).

Further, the term "direct financial benefit" had been interpreted consistently with the similar common law standard for vicarious copyright liability. Thus, the relevant inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-1118 (9th 2007) ("CCBill").

Here, Defendant does have the right and ability to control the infringing activity, as its own website controls whether users are able to download. According to the FAQ's, if a member is not a Premium Member, he can only view the videos, cannot view premium versions, and

---

[2] If a Defendant does have actual or apparent knowledge, it must show that it acted "expeditiously to remove, or disable access to, the [infringing] material" or lose the safe harbor protection. 17 U.S.C. § 512(c)(1)(A)(iii). Here, Defendant has known of this for years and not done anything about it. The videos continue to be posted. Complaint, ¶ 24.

cannot download. However, once Xhamster receives the subscription of $29.95 per month – a direct financial benefit – the user may download the videos. Plaintiff's Complaint alleges that Defendant received this financial benefit directly from this infringing activity. Complaint ¶ 37. In paragraph 38, Plaintiff goes on to allege that the "user is permitted to download the films only with further financial benefit to Defendant. Defendants" who "give away unauthorized viewing of Plaintiff's property then sell unauthorized copies of Plaintiff's property without any benefit to Plaintiff." Thus, the Complaint alleges that the infringement directly financially benefits Defendant.

Likewise, the Complaint alleges that the "purchasing public has come to know, rely upon and recognize the marks of Plaintiff" as assuring that the video will be high quality entertainment. ¶¶ 5-15. In other words, the public knows and looks for the material for which Plaintiff owns the copyright. Thus, per the Ninth Circuit's decision in *CCBill*, the infringing activity, posting and distributing Plaintiff's videos, "constitutes a draw for subscribers, not just an added benefit." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d at 1117-1118.

The foregoing shows that Defendant is not entitled to the safe harbor protection as it asserts. The knowledge, control and financial gain from the infringement of Plaintiff's copyrights takes Defendant out of the safe harbor of the DMCA. For that reason, the Court must deny Defendant's motion to dismiss.

## CONCLUSION

Defendant's claims that Plaintiff has created an Iowa company and opened an Iowa office for the purpose of forum shopping in Iowa are silly and baseless. Plaintiff is a duly registered Iowa Limited Liability Company with a real office in Northwood, Iowa and entitled to bring its claims in this Court. Plaintiff has made claims for infringement of its rightfully owned United States Copyrights and Trademarks and therefore has standing to bring this action. Defendant

33

clearly does not understand the concept of "successor in interest" nor does it understand that what was true in 2005 has changed since then, rendering its arguments based upon changed circumstances invalid. Defendant is properly and fairly under the jurisdiction of this Court, having met the due process requirements to be hailed into this court. Defendant's assertions that US trademarks and copyrights, rightfully owned by an Iowa company, should somehow be litigated in an alien court in Cyprus, where Defendant would argue a defense under the U.S. DMCA, simply because a LLC member is a Cyprus entity are astounding, and Defendant fails to cite how the status of a company's owners will remove jurisdiction from an Iowa company to an alien court. Defendant is not qualified for safe harbor protection under the DMCA and thus its final argument also fails as well.

Defendant has not met its burden and the Motion to Dismiss should be DENIED.


DATED: October 3, 2011                    Respectfully submitted,

                                          By:

                                               /s/ Chad L. Belville
                                               cbelville@azbar.org
                                               Chad Belville, Attorney at Law
                                               Attorney for Plaintiff
                                               Iowa Bar # 015731

Physical Address                               304 East Beth Drive
                                               Phoenix, AZ 85042

MAILING ADDRESS:                               P.O. Box 17879
                                               Phoenix, AZ 85066

                                               Telephone: 602-904-5485
                                               FAX: 602-297-6953
                                               E-mail cbelville@azbar.org
                                               ATTORNEY FOR PLAINTIFF

34

Certificate of Service

I, Chad Belville, Attorney for Plaintiff, hereby certify that on October 3, 2011 a copy of this Brief in Support of Resistance to Defendants' Motion to Dismiss was served upon the Attorneys for Defendants, listed as Connie M. Alt, Jennifer Rinden, Valentin Gurvits, and Evan Fray-Witzer, through the Courts Electronic Case Filing System.

<u>/s/ Chad L. Belville</u>

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit A | Current Defendant Terms of Service Page |
| Exhibit B | Defendant's Premium Membership Sign up Page |
| Exhibit C | Defendant's Webmaster Partnership Program Sign up Page |
| Exhibit D | Assignment of Copyright to Fraserside IP LLC |
| Exhibit E | Certificate of Assignment of Trademarks to Fraserside IP LLC |
| Exhibit F | Archived Defendant FAQ |